IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DONTE NALLS, #362086                   \*
        Petitioner
     v.                                   \*    CIVIL ACTION NO. JKB-13-1074

BOBBY P. SHEARIN,[1] *et al.*,          \*
        Respondents
                                           \*\*\*\*\*

MEMORANDUM

Petitioner Donte Nalls (hereinafter referred to as "Nalls") seeks habeas corpus relief pursuant to 28 U.S.C. § 2254, attacking the constitutionality of his 2009 convictions in the Circuit Court for Baltimore County. ECF No. 1. Respondents' answer to the petition and Nalls's reply remain pending. ECF Nos. 7 & 10. After review, the court finds no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts*, and Local Rule 105.6 (D. Md. 2014); *see also Fisher v. Lee*, 215 F.3d 438, 455 (4th Cir. 2000) (petitioner not entitled to a hearing under 28 U.S.C. § 2254(e)(2)).

**Background and Procedural History**

As recounted by the Court of Special Appeals of Maryland, the evidence adduced at trial was the following:

> Cassie Harris testified that, on April 18, 2009, she and some friends went to a club on Ponca Street in Baltimore City. While there she encountered appellant, whom she knew as an acquaintance though Brian and Moses Santiago. Ms. Harris had previously dated Brian Santiago, appellant's cousin. Brian had visited her numerous times at her home on St. Claire Lane in Baltimore County, where Ms. Harris resided with her mother, step-father, and younger siblings.

---

[1]      Frank A. Bishop, Jr. is currently the Warden at the North Branch Correctional Institution. The docket shall be amended accordingly.

While at the club, her conversation with appellant escalated into a physical confrontation. Appellant pushed her, and his brother "Woody" (later identified as Elwood Lewis), punched Ms. Harris in the face. The owners of the club took Ms. Harris to the kitchen, and the other patrons were "cleared out."

Ms. Harris and her friends then went to the Harris home, arriving there between 2:30 a.m. and 3:00 a.m. After speaking with her mother, Ms. Harris testified that she and her friends retired to her bedroom, which was located in the basement of the house.

Approximately two weeks earlier, Ms. Harris and her parents had switched bedrooms. For approximately five years, Ms. Harris occupied the bedroom located on the second floor of the house facing the back alley, and her parents occupied the basement bedroom. The second floor bedroom is located above the back porch, which is covered by a roof supported by three pillars. The bedroom has a double window located just above the porch roof. Ms. Harris testified that, during the years she occupied the second floor bedroom, she and her friends "many times" accessed the bedroom by climbing the pillars to the porch roof and entering through the window.

Sometime after retiring in the early morning hours of April 19, 2009, Ms. Harris heard a "bang" or "really loud like crash" and heard her mother scream. Ms. Harris ran upstairs and observed her mother and step-father on the floor of the bedroom (previously Ms. Harris' bedroom) and "blood everywhere."

Dontrell Jones, Ms. Harris' step-father, testified that, at approximately 5:00 a.m. while sleeping in their bed in the second-floor bedroom, he heard what sounded like "firecrackers." He then realized that he and his wife had been shot. Mr. Jones sustained several gunshot wounds, including two to his foot and one to his thigh. Mr. Jones did not see the shooter. He testified that the bedroom window was open.

Kelly Kimm, Ms. Harris' mother and Mr. Jones' wife, testified that, she heard "a loud popping noise, and it kept popping." She sustained four gun shot wounds. Ms. Kimm did not see the shooter.

Shannon Noble testified that on April 18, 2009, she, appellant, appellant's brother, Elwood Lewis (known as "Woody"), and Moses Santiago went together to a club called "Tolteca."[] They drove to the club in Mr. Santiago's burgundy colored van, with Mr. Santiago driving.

While at the club, appellant and his brother "got into an argument with some girl." After the "bouncer" told appellant and Mr. Lewis to leave, Ms. Noble, appellant, and Mr. Lewis went "out front" and then a "fight broke out." The police arrived, and appellant and Mr. Lewis were arrested.

2

Ms. Noble and Mr. Santiago then drove away in his van and eventually parked near the house where Ms. Noble believed Mr. Santiago lived. Jose Reyes, another friend, then arrived, and he and Mr. Santiago talked about what happened at the club. While Ms. Noble waited in the van for Mr. Santiago to take her home, Mr. Santiago and Mr. Reyes went into the house. Mr. Santiago and Mr. Reyes subsequently rejoined her in the van, and they proceeded to pick up appellant and his brother, who had been released from police custody.

After appellant and his brother entered the van, they talked was about the incident in the club and "what they were going to do." Mr. Santiago drove to Mr. Reyes' house, where appellant lived with his girlfriend, Carla Reyes, Jose's sister. Ms. Noble testified that Mr. Reyes and Mr. Lewis left the van, went into the house, and returned carrying "two shirts" in their hands.

Mr. Reyes testified that appellant wanted "to beat up" Ms. Harris and planned to go to her house. He testified that appellant and Mr. Lewis "went upstairs [in the Reyes' house] and grabbed some guns."

Ms. Noble and Mr. Reyes both testified that they, Mr. Santiago, appellant, and Mr. Lewis left in Mr. Santiago's van. Mr. Reyes observed that appellant and Mr. Lewis each had a gun in hand. He described the gun appellant held as an "automatic." Mr. Reyes testified that appellant said they were going to Ms. Harris' house to shoot her.

Both Ms. Noble and Mr. Reyes testified that, when the van stopped, appellant and Mr. Lewis got out, and a few minutes later, they heard gunshots. Shortly thereafter, appellant and Mr. Lewis returned to the van, each carrying a gun. Ms. Noble testified that, when appellant returned to the van, he "said he gunned her down."

After appellant and Mr. Lewis returned to the van, and as they drove down the street, a gun went off behind Ms. Noble, hitting her in the arm and grazing her leg and also hitting Mr. Santiago in the arm.[] Mr. Santiago let appellant and Mr. Lewis out of the van and then drove to Johns Hopkins hospital. When appellant exited the van, "he said not to say what happened." Mr. Reyes testified that appellant and Mr. Lewis took the guns with them when they left.

Neither Ms. Noble nor Mr. Reyes initially told the police the truth about what happened. They both claimed, however, that they eventually did tell the police the truth and that their in-court testimony was truthful.

After the incident, Ms. Noble was detained for a period of time at the Baltimore County Detention Center. While awaiting a bail review hearing, someone "dropped a note" onto her lap, which subsequently was retrieved by a correctional

3

officer. The hand-written note was admitted into evidence. Ms. Noble recognized the handwriting on the note as that of appellant's. She testified that she saw appellant before she went into her bail review hearing.

The unsigned note reads in part:

> Shannon if they ask you what happen about the case say that you got held hostage by José an somebody that had on sunglasses and a skully on. This is what you tell them. You and Moises went to go pick up José from his house (on Ellwood). Because he called Moises phone telling him to come pick him up. Once you got to José house he was already waiting outside with the guy with the sunglasses and skully on. José got up front and the guy sat all the way in the back. All you heard once José got in in tell Moises to drive 2 North Point Blvd. You didn't hear him say why. Once ya'll got out there, you heard José 2 tell the guy 2 stay in the van with ya'll while he went an go do something. Next thing you heard was gunshots and saw José running from an alley towards the van…. Then the guy in the backseat said if you say anything he was going 2 shoot you. That's when you had a few words with him and the next thing you heard was a gunshot and it hit you in the arm and you saw Moises bleeding to…On ya'll way to the hospital José felt bad and said he was sorry for any of this to happen. That's when you heard him tell Moises 2 drive 2 the hospital. You tell them on ya'll way 2 bayview ya'll seen me and Woody on the 23 bus stop. That's when you heard José tell Moises 2 stop. Ya'll can hollar at us, and he told ya'll not to say nothing. Once ya'll pulled up José took off his shoes (which were white on white low cut AF1s) and gave them 2 Woody because he ask Woody 2 switch shoes… Baby girl I love you 2 death it's up 2 you and Moises 2 get us home. If they tell you 2 make a statement tell them what I just wrote you…we can beat this if you and Moises write the same statement…José's <u>not</u> going 2 show up 4 court so don't worry about it. Moises know's he fucked up. José snitched 1st so the tables R about 2 turn on him. I love you Shannon don't break under pressure over there. They don't have shit except for José's and Moises statement but the statement Moises gave, he gave while he was drug up and they can't question nobody that's drug up. We gonna make it.

Ms. Noble testified that she had spoken by telephone with appellant after she left the Detention Center. He told her not to testify truthfully and "[d]on't get on the stand."

4

Officer Edward Mikula, a member of the Baltimore County Police Department, testified that he was dispatched to the crime scene at 5:52 a.m. He observed two spent shell casings lying on the floor of the bedroom and another spent shell casing lying on the porch roof "like two feet away from the window." The police believed that the shots were fired through the open bedroom window. The shell casings were later determined to be from a nine millimeter Luger and to have been fired from the same firearm.

Erin Vinson, a technician with the Baltimore County Crime Lab, testified that she recovered fingerprints from the "structural pole" supporting the roof over the porch. Robert Huncher, a latent print examiner for the Baltimore County Police Department, testified that fingerprints on the pole matched appellant's fingerprints.

Detective Scott Fischer, a member of the Baltimore County Police Department Violent Crimes Unit, testified that, while executing a search and seizure warrant on Mr. Santiago's van, he recovered a "live 9 millimeter Luger Winchester, full round and a spent cartridge casing" and a 9 millimeter Luger Winchester. The casing was later determined to have been fired from the same firearm as the casings found at the crime scene.

Detective Fischer also assisted in the execution of a search and seizure warrant at North Ellwood Street, the Reyes' residence, where appellant resided. In a search of the upstairs front bedroom, which Jose Reyes testified was the bedroom his sister shared with appellant, the police recovered from a lockbox under the bed, "13 nine millimeter rounds" stamped with "Win nine MM Luger."

Appellant was arrested the day of the shooting. He was interviewed by Detective Eric Dunton, a member of the Baltimore County Police Violent Crimes Unit, the primary investigative detective in the case. The interview was recorded, but it does not appear from the record before us that the recorded interview was introduced into evidence or played for the jury. Rather, Detective Dunton testified about his interview with appellant.

Detective Dunton testified that he advised appellant of his Miranda[] rights and that appellant agreed to speak with him. At the time of the interview, appellant "seemed fine, very articulate in his answers." Detective Dunton asked appellant what happened the night before at the club, and appellant said that "his brother got into a verbal argument that escalated into a physical fight with a female." Appellant stated that, after his release from the southeastern police district, he took a bus home to his girlfriend's house. He denied getting a ride from Mr. Santiago at that point in time.

> Detective Dunton advised appellant that shell casings were found at the shooting scene, and he asked appellant whether his fingerprints would be found there. Appellant "guaranteed" that they would not be found.
>
> During the interview, appellant confirmed where he lived and which bedroom in the house was his. Because appellant "had indicated that he had Moses Santiago's cell phone on him throughout the entire evening," Detective Dunton asked if appellant "could explain why that cell phone would be in Dundalk at any part of the evening, especially between…5:48 [a.m.] and 5:54 [a.m.]," but appellant had no answer.
>
> Carla Reyes, Jose's sister, testified as the sole witness for the defense. Ms. Reyes testified that, at the time of the shootings, appellant was with her at home, in bed.

ECF No. 7 at Ex. 9, pp. 2-9.

Nalls was convicted by a jury sitting in the Circuit Court for Baltimore County of attempted first-degree murder, three counts of first-degree assault, three counts of using a handgun in the commission of a crime, and possession of a regulated firearm with a felony conviction. ECF No. 7, Ex. 1. On March 24, 2010, Circuit Court Judge Thomas Bollinger sentenced Nalls to a cumulative life sentence as to the aforementioned counts. *Id.*, Ex. 6, Tr. at pp. 21-23

> On appeal, Nalls raised the following claims:
>
> 1. The sentence for first-degree assault of Cassie Harris must be vacated under the doctrine of merger;
>
> 2. The trial court erred in instructing the jury that appellant was disqualified from possessing a regulated firearm;
>
> 3. The trial court abused its discretion, and failed to properly exercise discretion, in denying appellant's request for a postponement permitting him to obtain new counsel;
>
> 4. The trial court erred in admitting recordings of jailhouse conversations, in which appellant was alleged to be a participant, in the absence of proper authentication, and in violation of the rules of discovery; and

> 5. The trial court erred in admitting that portion of appellant's statement to police after his repeated invocations of the right to counsel.

*Id.*, Exs. 7 & 8.  On March 26, 2012, the Court of Special Appeals of Maryland granted Nalls relief as to his first claim, concluding that sentence for first-degree assault as to Ms. Harris should have been merged with his sentence for attempted first-degree murder on Ms. Harris. The Court of Special Appeals also vacated Nalls's conviction for illegal possession of a regulated firearm and remanded that count for a new trial.  *Id.*, Ex. 9 at pp. 10-14.  The intermediate appellate court otherwise affirmed Nalls's convictions.  *Id.*, Ex. 9 at pp. 15-38. Nalls's petition for writ of certiorari was summarily denied by the Court of Appeals of Maryland on August 12, 2012.  ECF No. 7, Exs. 10-11.  No further petitions for collateral relief were filed in the state courts.

In filing the instant § 2254 petition, Nalls asserts the following grounds associated with trial court issues:

1. trial court error in instructing the jury that Nalls was "disqualified from possessing a regulated firearm;"

2. trial court abuse of discretion in denying Nalls a postponement to obtain new counsel;

3. trial court error in admitting recordings of jailhouse conversations, in which Nalls was alleged to be a participant, in the absence of proper authentication and in violation of the rules of discovery; and

4. trial court error in admitting a portion of Nalls's statement to police following his repeated invocations of the right to counsel.

ECF No. 1 at pp. 5 & 6.

## Preliminary Matters

Exhaustion of State Remedies

Respondents do not contend that the grounds presented are unexhausted.

## Statute of Limitations

Respondents do not contend – and the court does not find – that the petition is time-barred pursuant to 28 U.S.C. § 2244(d).

## Procedural Default

Respondents assert that Nalls's fourth ground alleging that Judge Bollinger erred in admitting a portion of his statement to police following his repeated invocations of the right to counsel in violation of *Miranda*[2] is procedurally defaulted, as the Court of Special Appeals of Maryland analyzed but declined to address the issue. The Court of Special Appeals explained:

> Appellant's final contention is that the "trial court erred in admitting the portion of appellant's statement to police following his repeated invocations of the right to counsel." He argues that Detective Dunton did not "scrupulously honor" appellant's invocation of the right to counsel and "neither stopped speaking nor stopped asking questions," and therefore, his motion to suppress his statement should have been granted.
>
> As indicated, Detective Dunton interviewed appellant at the Baltimore County Police Headquarters building, after advising appellant of his Miranda rights. The interview was audio and video recorded. The CD of the interview shows that appellant waived his Miranda rights, and began speaking with Detective Dunton. He subsequently indicated that he wanted to speak with an attorney.
>
> During trial, defense counsel moved to suppress that portion of the interview that occurred after appellant stated that he wanted to talk to an attorney.[] The court initially granted the motion, but the State subsequently asked the court to reconsider its ruling, arguing that, after appellant requested to speak to an attorney, he thereafter "reinitiated" the interview with Detective Dunton, permitting further questioning.
>
> Portions of the interview were played for the court.[] After viewing the interview and hearing argument from counsel, the court reversed its ruling and denied the motion to suppress. The court found the appellant, at the onset of the interview, had waived his Miranda rights, and although he later invoked his right to counsel, appellant subsequently "knowingly, voluntarily waive[d] his right of Miranda" when he affirmatively stated: "I know I'm incriminating myself if I keep talking."

---

[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

> Appellant asserts in his brief that "the interview was ultimately utilized against him in its entirety." He fails, however, to point to any post-invocation statement that was admitted at trial.[] It does not appear that the recorded interview was introduced into evidence or played for the jury.[] Although Detective Dunton testified regarding the interview, appellant fails to point to any specific testimony by Detective Dunton addressing statements made by appellant that occurred after appellant requested to speak to an attorney. Without knowing which statements were admitted, we cannot assess whether any error in admitting the statements was prejudicial error requiring reversal. It is not our job to search the record for facts that support appellant's position. *Vandergrift [v. State]*, 82 Md. App. [617, 633] [(1990)] (appellate court is "not required to ferret out from the record factual support favorable to [appellant's] argument"). Accordingly, we decline to address this issue.

The procedural default doctrine bars consideration of a claim in a petition for habeas corpus in the absence of a showing of cause and prejudice or actual innocence. *See Murray*, 477 U.S. 478, 495 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977). Even where a petitioner fails to show cause and prejudice for a procedural default, a court must still consider whether it should reach the merits of the petitioner's claims in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 314 (1995); *Bostick v. Stevenson*, 589 F.3d 160, 164 (4th Cir. 2009). The miscarriage of justice standard is directly linked to innocence. *Schlup*, 513 U.S. at 320. Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id*. at 315. The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray*, 477 U. S. at 496.

The Court of Special Appeals for Maryland declined to review Nalls's fourth ground as it was presented. Nalls was given an opportunity here to explain why this claim should not be procedurally defaulted. ECF No. 9. He asserts that his appellate counsel "did not satisfy the State requirements to have his fourth ground considered for habeas relief" and he "is

9

withdrawing and abandoning this claim." ECF No. 10 at p. 18. The ground shall be considered withdrawn and shall not be addressed on the merits.

## Standard of Review

An application for writ of habeas corpus may be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). The federal habeas statute at 28 U.S.C. § 2254 sets forth a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997); *see also Bell v. Cone*, 543 U.S. 447 (2005). This standard is "highly deferential" and "difficult to meet." *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S. Ct. 1388, 1398 (2011); *Harrington v. Richter*, 562 U.S 86, 131 S. Ct. 770, 786 (2011).

A federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits 1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States"; or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state's adjudication is contrary to clearly established federal law under § 2254(d)(1) where the state court 1) "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or 2) "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Under the "unreasonable application" analysis under § 2254(d)(1), a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, "an unreasonable

application of federal law is different from an incorrect application of federal law." *Id*. at 785 (internal quotation marks omitted).

Further under § 2254(d)(2), "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if reasonable minds reviewing the record might disagree about the finding in question," a federal habeas court may not conclude that the state court decision was based on an unreasonable determination of the facts. *Id*. "[A] federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied established federal law erroneously or incorrectly." *Renico v. Lett,* 559 U.S 766, 773 (2010).

The habeas statute provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). "Where the state court conducted an evidentiary hearing and explained its reasoning with some care, it should be particularly difficult to establish clear and convincing evidence of error on the state court's part." *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). This is especially true where state courts have "resolved issues like witness credibility, which are 'factual determinations' for purposes of Section 2254(e)(1)." *Id*. at 379. Nalls has failed to meet the high standard meriting habeas corpus relief, for reasons addressed below.

## Analysis

### I.     Trial Court Error

Nalls first claims that the trial court erred when it mistakenly instructed the jury that he was disqualified from legally possessing a regulated firearm based upon his conviction on

11

second-degree assault, a disqualifying "crime of violence" in Maryland. Respondents correctly observe that this ground was rendered moot when the Court of Special Appeals of Maryland granted relief as to this issue, vacated the firearm possession conviction, and remanded the count for a new trial. *See* ECF No. 9, Ex. 9 at pp. 12-14.  That Nalls disagrees with the manner in which the Court of Special Appeals vacated his conviction on this count is of no moment.[3]  ECF No. 10 at pp. 3-13.

Further, it is correctly observed that the ground raises no federal claim and is therefore not a basis for habeas corpus relief.  The federal habeas statute "unambiguously provides that a federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 16 (2010) (quoting 28 U.S.C. § 2254(a)).  It is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts. "Federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." 502 U.S. at 67–68.

A claim that a state prisoner is being held in violation of state law will not suffice. Nalls asserts that nowhere in the instructions for filing a § 2254 petition does it state that a petitioner must list "how his grounds are federal claims" and he was never notified by the court that he had failed to present federal claims. ECF No. 10 at p. 15. This assertion, however, does not provide a basis for consideration of the claim.

---

[3] Nalls claims that Judge Bollinger's instructions on the firearm possession count "unfairly prejudiced and tainted" his other charges.  He provides no legal or factual basis for the assertion that his attempted murder, first-degree assault, and handgun-use convictions should have been vacated.

Nalls next claims that Circuit Court Judge Bollinger abused his discretion in denying Nalls a mid-trial postponement to obtain new counsel because Nalls had not reviewed discovery materials. Nalls additionally claims that Judge Bollinger erred in admitting recordings of jailhouse conversations, in which Nalls was alleged to be a participant, in the absence of proper authentication and in violation of the rules of discovery.[4] Respondents argue that these grounds are likewise subject to dismissal because they do not allege a violation of the laws or treaties of the United States.   This court agrees and finds that these trial court error claims are not subject to review.[5]

---

[4]    Presumably, Nalls is rearguing the ground raised on direct appeal before the Court of Special Appeals of Maryland, which concerns discovery in the circuit court and the authentication and identification of evidence, advanced under Md. Rule 4-263(d)(9), Md. Rule 5-901(a),  and *Washington v State*, 406 Md. 642, 961 A.2d 1110 (2008). ECF No. 7, Ex. 7 at pp. 15-17.

[5]    Even if the court were to generously construe Nalls's claim against Judge Bollinger for the failure to grant him a mid-trial postponement to obtain replacement counsel as a Sixth Amendment claim, it would find the ground subject to dismissal on procedural default grounds as it was not raised in the state court.  The Sixth and Fourteenth Amendments guarantee that a person brought to trial in any state or federal court is afforded his right to assistance of counsel before he can be validly convicted and punished by imprisonment.  *See Powell v. Alabama*, 287 U.S. 45, 53 (1932).  A right to counsel generally includes the right to counsel of choice, if defendant can afford to retain counsel, and includes the right to reasonable opportunity to obtain counsel of choice.  *See United States v. Inman*, 483 F.2d 738, 739-40 (4th Cir. 1973).  This right is not absolute.  An indigent defendant has no right to be represented by a particular lawyer and can demand a different attorney only for good cause.  *See Morris v. Slappy*, 461 U.S. 1, 23 n.5 (1983); *United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988); *see also Miller v. Smith*, 115 F.3d 1136, 1143-44 (4th Cir. 1997); *United States v. Mullen*, 32 F.3d 891 (4th Cir. 1994).

Nalls presented nothing to the trial court, or here, to illustrate good cause for discharging Marc Mandel as his appointed defender.  The record shows that Mandel appeared on Nalls's behalf.  In mid-trial, Nalls indicated he would like another attorney because he had not had the opportunity to review "pictures and all that"; while Mandel had seen him in the jail, Nalls "did not get really in my discovery like that"; and he was "not being represented right." ECF No. 7, Ex. 3, Tr. at pp. 61-62.  Judge Bollinger concluded that trial would not be postponed.  Nalls was given the option of proceeding with Mandel or proceeding pro se and indicated he would like to proceed with Mandel.  *Id.*, Ex. 3, Tr. at 62-63.

**Conclusion**

In light of the rulings of the court, the instant petition for habeas corpus relief will be denied, and this case will be dismissed by separate Order. When a district court dismisses a habeas petition, a certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A prisoner satisfies this standard by demonstrating that reasonable jurists would find that his constitutional claims are debatable and that any dispositive procedural rulings by the district court are also debatable or wrong. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). Nalls does not satisfy this standard, and the court declines to issue a certificate of appealability.


Date: October 9, 2014                             /s/
                                            James K. Bredar
                                            United States District Judge